[Cite as *State v. Saunders*, 2026-Ohio-2591.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :       APPEAL NO.    C-250519
                                                TRIAL NO.     B-2303657
     Plaintiff-Appellee,            :

  vs.                                   :
                                                        *JUDGMENT ENTRY*
RUDEL SAUNDERS,                         :

     Defendant-Appellant.           :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/8/2026 per order of the court.**


**By:**_____
       **Administrative Judge**

[Cite as *State v. Saunders*, 2026-Ohio-2591.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-250519 |
| | | TRIAL NO. | B-2303657 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | *O P I N I O N* | |
| RUDEL SAUNDERS, | : | | |
| Defendant-Appellant. | : | | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 8, 2026


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Norbert Wessels,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher, William R. Gallagher*, and *Elizabeth Conkin*, for Defendant-Appellant.

**NESTOR, Judge.**

{¶1} When defendant-appellant Rudel Saunders was a medical resident, he conducted unsupervised ultrasounds in his bedroom. As a result, he was found guilty of two counts of practicing medicine without a license or certificate. Saunders appeals his convictions. Because conducting at-home ultrasounds was beyond the scope of Saunders's residency program, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶2} Saunders was tried at a bench trial on July 21 and 22, 2025. The evidence adduced at trial is as follows.

{¶3} Saunders was a first-year medical resident at the University of Cincinnati Hospital ("UC"). As a resident, Saunders possessed a training certificate. A training certificate is a license issued by the State Medical Board of Ohio that permits residents to practice medicine within the scope of their residency programs. Saunders's training certificate permitted him to practice medicine within the scope of UC's residency program—in a clinical setting, under the supervision of an attending doctor.

{¶4} Saunders met G.L. and C.C. through the local running community. He met G.L. at a run club, and messaged C.C. on Strava (a fitness/social media app). Saunders befriended G.L. and C.C. and began running with each of them.

{¶5} During the runs, Saunders told G.L. and C.C. about his work as a medical resident. He told them that he was required to perform 100 ultrasounds as part of his residency. G.L. and C.C. testified that they agreed to undergo ultrasounds to assist Saunders in reaching the 100 ultrasounds that Saunders allegedly needed for his program.

{¶6} Dr. Michael Hellman, a pulmonary and critical care doctor at UC,

testified that UC's residency program has no such requirement. Dr. Hellman never instructed Saunders to perform ultrasounds or any type of medical care outside of a clinical setting.

{¶7} Saunders performed the ultrasounds on G.L. and C.C. in his bedroom at his home. G.L. admitted that he was surprised Saunders instructed him to meet at Saunders's home, rather than at the hospital. Nonetheless, G.L. testified, "I just kind of blindly put my trust in [Saunders] as a friend and I trusted him as a medical provider."

{¶8} Saunders instructed G.L. and C.C. to undress in the bathroom and lie down on the bed. He gave them a small towel to cover themselves.

{¶9} To perform the ultrasounds, Saunders used a butterfly machine, which is a type of portable ultrasound machine. Dr. Hellman testified that UC generally does not use these types of machines. The butterfly connects to a phone, which displays a live ultrasound feed. Saunders gave the phone to G.L. and C.C. to view the feed as he was conducting the ultrasounds.

{¶10} During the ultrasounds, Saunders "loosely" described images that appeared on the phone screen to G.L. and C.C. Saunders provided them with diagrams of the heart and other internal organs to view during the procedure. Saunders would reference the diagrams and compare them to what appeared on the phone screen.

{¶11} When describing the ultrasound, G.L. testified that Saunders "was just continuously moving around to my arms, my chest, my abdomen, my legs. And then he moved to my genital area. I was just very kind of in shock at this moment, but [Saunders] had gone through these things. He asked permission if he could. I said yes. He then spent what I would consider an exorbitant amount of time in that area . . . it just made me feel very, very uncomfortable."

4

{¶12} Unbeknownst to G.L. and C.C. at the time, Saunders recorded himself conducting the ultrasounds. The State introduced these videos as evidence at trial.

{¶13} After the ultrasounds were complete, Saunders told G.L. and C.C. that he would send them the ultrasound results. He instructed them to set follow-up appointments to "see if there was anything that had developed."

{¶14} Around January 2023, a complaint was filed against Saunders with the State Medical Board of Ohio. Later that year, a grand jury indicted Saunders on three counts of practicing medicine without a license or certificate, which are fifth-degree felonies, in violation of R.C. 4731.41.

{¶15} After a bench trial, the trial court found Saunders guilty on Counts 1 and 3. Count 2 was dismissed for want of prosecution. The trial court sentenced Saunders to 180 days on each count, to be served concurrently, and five years of community control.

{¶16} Saunders appeals his convictions.

## II. Analysis

{¶17} Saunders presents three assignments of error. First, he argues that the trial court erred in convicting him under R.C. 4731.41 because the evidence is insufficient to show that he held himself out to be a doctor. Next, he argues that the trial court erred in convicting him because the evidence is insufficient to show that he performed examinations for compensation. Third, and finally, Saunders argues that his convictions are against the manifest weight of the evidence.

### A. First Assignment of Error

{¶18} Saunders first challenges his convictions under R.C. 4731.41 by arguing that the evidence was insufficient to show that he held himself out to be a doctor.

{¶19} In reviewing the sufficiency of the evidence, we must determine whether

"any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. In making this determination, we must view the evidence in the light most favorable to the State. *Id.*

{¶20} R.C. Ch. 4731 governs the practice of medicine in Ohio. The trial court found Saunders guilty of violating R.C. 4731.41. This statute provides, in pertinent part, "No person shall practice medicine . . . without the appropriate license or certificate from the state medical board to engage in the practice." R.C. 4731.41(A).

{¶21} R.C. 4731.34 contextualizes R.C. 4731.41 by defining what constitutes the practice of medicine. R.C. 4731.34(A) articulates three ways in which "[a] person shall be regarded as practicing medicine[.]" Relevant to Saunders's first assignment of error, if a person "[u]ses the words or letters, 'Dr.,' 'Doctor,' 'M.D.,' 'physician,' 'D.O.,' 'D.P.M.' or any other title in connection with the person's name in any way that represents the person as engaged in the practice of medicine" then that person "shall be regarded as practicing medicine[.]" *Id.*

{¶22} Saunders argues that the record contains insufficient evidence to show that he referred to himself as a doctor to G.L. and C.C. Therefore, Saunders argues, the State has not met its burden to prove that Saunders was practicing medicine.

{¶23} However, G.L. and C.C. both testified that while on runs, Saunders told them he was a doctor. G.L. testified that Saunders "referred to himself as [either] a resident, attending, or doctor[.]" C.C. testified that Saunders said that "he was a resident doctor at UC." This evidence is sufficient to show that by "[using] the words or letters, 'Dr.,'" or "'Doctor,'" Saunders "represent[ed]" himself "as engaged in the practice of medicine" within the meaning of R.C. 4731.34.

{¶24} Next, Saunders argues that even if the record does contain evidence that

he referred to himself as a doctor, R.C. 4731.34(A) does not prohibit a medical resident with a training certificate from calling himself a doctor.

{¶25} It is true that Saunders was a medical resident. And it is true that medical residents have completed medical school and are considered "doctors in training." *Smith v. Midwest Health Servs., Inc.*, 1993 Ohio App. LEXIS 1384, *6 (1st Dist. Mar. 10, 1993). However, this argument is unpersuasive.

{¶26} R.C. 4731.41 prohibits practicing medicine "without the *appropriate* license or certificate[.]" (Emphasis added.) The Ohio Supreme Court considered the scope of a license under R.C. 4731.41 in *State v. Rich*, 44 Ohio St.2d 195, 197 (1975). In *Rich*, the defendant was a licensed chiropractor. *Id.* He used acupuncture to treat patients. *Id.* The Court held that the defendant violated R.C. 4731.41 because acupuncture was outside the scope of the defendant's chiropractic license. *Id.* at 198. "[T]he fact that [acupuncture] was not prohibited verbatim by his certificate does not allow [defendant] to employ techniques that go beyond those rules and regulations promulgated by the State Medical Board which govern the scope of chiropractic medicine." *Id.*

{¶27} Thus, even if a person has a certificate which allows them to practice medicine, the person violates R.C. 4731.41 when practicing outside the scope of that certificate.

{¶28} R.C. 4731.291 describes the scope of permissible conduct for those with training certificates.

> The holder of a valid training certificate shall be entitled to perform such acts as may be prescribed by or incidental to the holder's internship, residency, or clinical fellowship program, but the holder shall not be entitled otherwise to engage in the practice of medicine and

surgery or osteopathic medicine and surgery in this state. *The holder shall limit activities under the certificate to the programs of the hospitals or facilities for which the training certificate is issued.* The holder shall train only under the supervision of the physicians responsible for supervision as part of the internship, residency, or clinical fellowship program.

(Emphasis added.) R.C. 4731.291(C).

**{¶29}** Dr. Hellman testified that performing ultrasounds or otherwise practicing medicine outside of a clinical setting was not part of Saunders's residency program at UC. Therefore, Saunders lacked the appropriate license to perform ultrasounds outside of what he was specifically instructed to do as part of his residency.

**{¶30}** Overall, the record contains sufficient evidence to support Saunders's convictions under R.C. 4731.41. The first assignment of error is overruled.

### B. Second Assignment of Error

**{¶31}** Saunders's second assignment of error asserts that the trial court erred in convicting him under R.C. 4731.41 because the evidence is insufficient to show that he performed examinations for compensation.

**{¶32}** In addition to calling themselves a doctor, a person may also "be regarded as practicing medicine" if that person "[e]xamines or diagnoses for compensation of any kind[.]" R.C. 4731.34(A)(3). Compensation may be "direct or indirect[.]" *Id.*

**{¶33}** Based on our disposition of the first assignment of error, we need not reach Saunders's second assignment of error. *State v. Baylor*, 1 Ohio App.3d 73, 74 (1st Dist. 1981) (when the State proves that a defendant engaged in the unlawful practice of medicine by holding himself out to be a doctor without proper certification,

8

the State was "not required to make a further showing that the [defendant] treated patients or that he was given compensation for such treatment.") But to be sure, the record reflects that Saunders received a benefit for his acts.

**{¶34}** Saunders argues that he received no monetary compensation. But "there is no requirement within R.C. 4731.34 that compensation be of a monetary nature; indeed the statutory language 'compensation of any kind' indicates compensation in forms other than money was perceived by the General Assembly in enacting the statute." *Mirsa, Inc. v. State Med. Bd.*, 42 Ohio St.2d 399, 402 (1975).

**{¶35}** The trial court found that Saunders was compensated for his acts. In making that finding, the trial court reasoned that Saunders told G.L. and C.C. "that allowing [Saunders] to do the ultrasounds would be a benefit, a plus, a value to his training regarding his medical career." The trial court further opined "[t]hat certainly appears to be an indirect compensation for [Saunders]."

**{¶36}** We agree. By his own justification for why he conducted the ultrasounds, Saunders was compensated. The second assignment of error is overruled.

### C. Third Assignment of Error

**{¶37}** Third and finally, Saunders challenges the manifest weight of the evidence.

**{¶38}** A manifest weight challenge requires the appellate court to "sit as the 'thirteenth juror,' review the entire record, consider witness credibility, and determine if the fact finder 'clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thacker*, 2025-Ohio-4446, ¶ 18 (1st Dist.), quoting *State v. Nichols*, 2025-Ohio-1515, ¶ 18 (1st Dist.). We may only reverse convictions as against

the manifest weight of the evidence in "'exceptional cases where the evidence weighs heavily against the conviction.'" *Id.*, quoting *State v. Harper*, 2025-Ohio-2059, ¶ 18 (1st Dist.). We "must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21.

**{¶39}** Saunders's convictions are not against the manifest weight of the evidence. The evidence at trial included testimony from victims G.L. and C.C. The State introduced videos of the ultrasounds, secretly recorded by Saunders, that corroborated the victims' testimony. Dr. Hellman testified that Saunders's actions were outside the scope of what was permissible under his training certificate.

**{¶40}** The trial court, as the fact finder, was best positioned to evaluate the credibility of this evidence. This is not one of those rare cases that present "'such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *See Thacker* at ¶ 18, quoting *Nichols* at ¶ 18.

**{¶41}** The third assignment of error is overruled.

### III. Conclusion

**{¶42}** Having overruled Saunders's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE, P.J.,** and **MOORE, J.,** concur.